# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRANDON MICHAIL LEE,                    )
                                        )
                                        )
          Plaintiff,                    )    2:25-cv-1592
                                        )
     vs.                                )    Magistrate Judge Patricia L. Dodge
                                        )
FRANK J. BISIGNANO, COMMISSIONER        )
OF SOCIAL SECURITY,                     )
                                        )
                                        )
          Defendant.                    )

## MEMORANDUM OPINION

Plaintiff Brandon Michail Lee ("Lee") commenced this action against Frank J. Bisignano, the Commissioner of Social Security ("Commissioner"), pursuant to 42 U.S.C. § 405(g). Lee seeks judicial review of an unfavorable decision regarding his claims for Social Security Disability Insurance Benefits ("DIB"), a period of disability and Supplemental Security Income ("SSI"). Lee has moved for summary judgment.

For the reasons below, the Court will grant summary judgment in favor of Lee and remand this case to the Commissioner for further review.[1]

## I.    Procedural History

Lee filed an application for a period of disability and DIB on November 29, 2023. (R. 215-16.)[2] He filed an application for SSI on December 1, 2023. (R. 208-14.) In both applications, he alleged disability beginning on January 1, 2022. His claims were initially denied on May 2, 2024 and again on reconsideration on July 9, 2024. (R. 109-23.) He took an appeal seeking a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on January 24, 2025 before ALJ

---

[1] The parties have fully consented to jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF Nos. 9, 16.)

[2] Citations to the record (ECF No. 3) are referred to as "R."

Paul Kovac (R. 36-63.) ALJ Kovac issued an unfavorable decision on April 25, 2025, finding that Lee was not disabled under the Social Security Act. (R. 17-30.) Thereafter, Lee filed a request for review of hearing decision/order to the Appeals Council, and his appeal was denied on August 19, 2025. (R. 1-6.)

Lee filed this action seeking judicial review of the denial of benefits on October 14, 2025. On March 30, 2026, Lee moved for summary judgment (ECF No. 13), which has been fully briefed (ECF Nos. 15, 17).[3]

## II.    Factual Background

### A.  Lee's Background

Lee was born on September 19, 2002 and was twenty-two years old at the time of his hearing. (R. 65). He completed high school in special education. (R. 245; 43).

In 2019, while in the ninth grade, Lee was administered the Woodcock Johnson Tests of Cognitive Abilities, Fourth Edition as a measure of his cognitive reasoning ability, as well as select subtests. (R. 374-375.) Testing showed that Lee had "very low" general intellectual ability. (R. 374). Reading, broad reading, reading comprehension, academic skills, and brief achievement scores were all "very low." (R. 375.) His overall academic skills were far below that of 95% of his grade level. (R. 376). Lee was classified with a specific learning disability. It was recommended he receive accommodations including modified curriculum in all core subjects; modified classwork and assessments in all core subjects; modified grading; chunking lessons into smaller parts; repetition of lessons and repeated practice of skills; access to audio; chunking projects into

---

[3] Although the Commissioner did not move for summary judgment, the Supplemental Rules for Social Security indicate that "The action is presented for decision by the parties' briefs." (Supp. Rule 5.)

smaller, more manageable tasks with frequent check-in points; and frequent teacher check-ins to maintain attention and focus. (R. 381.)

In May 2019, Lee underwent neuropsychological testing for an initial evaluation of a potential head injury sustained in April 2019 in a skateboarding accident. (R. 419.) Initial imaging revealed a nose fracture, cervical strain, and concussion. (R. 419.) Following the accident, he reported difficulty with sleep onset, headache, and dizziness. (R. 419.) The May 2019 evaluation noted that he continued to complain of visual abnormalities and difficulty with concentration and focus and continued to have difficulty with sleep onset. (R. 219.) Lee also noted increased irritability, and increased symptoms of anxiety, frustration, and minor outbursts. (R. 419.) The progress notes indicate that Lee likely sustained a cerebral concussion, and his neurocognitive test scores were below expected baseline. (R. 422.) Vestibular screening was positive for dizziness and abnormal convergence with accommodation insufficiency. (R. 422.) Among other things, it was recommended that Lee have a regulated schedule and reasonable breaks when exposed to environments or situations that provoke symptoms. (R. 422.)

During a medical appointment for Lee in July 2022, Lee's mother expressed concern about his mood swings, frustration, and anger. (R. 531.) At times he did not eat, and he was up all night "with things on his mind." (R. 531.) Later the same month, Lee was evaluated by Dr. Nicola Gray for his difficulty with sleep and severe mood swings. When examined, Lee's mood was assessed depressed and irritable, his affect was constricted and his insight and judgment were poor. (R. 534-35.) Dr. Gray diagnosed dyslexia and bipolar 1 disorder. (R. 535.)

Lee was treated by NP Sharon Magan in January 2023 for irritability, mood stability, and hypomanic behaviors. (R. 541.) The medical records note that Lee felt anxious all the time; holding a conversation for a long time was draining; he was overthinking all night and did not sleep; he

felt angry a lot; and had thoughts of harming himself or others but did not act on them. (R. 541.) The records also reflect that Lee was working at a fast food restaurant and had previously worked at two others, and that it was stressful. (R.241.) He was assessed as having bipolar and anxiety disorders. (R. 241.)

Lee continued to feel anxious in May 2023 and obtained a medical marijuana card for anxiety. (R. 567.)  Dr. Magan saw Lee again in July 2023. It is noted that Lee had hypomanic periods where he was edgy, restless, irritable, and hypersexual. (R. 567.)

Dr. Magan's notes from a November 2023, examination state that Lee's mood swings were affecting his ability to go to work, because at times a "nervous feeling comes over him." (R. 595.) He had many days where he did not want to come out of his room and had racing thoughts. (R. 595.) Later that month, Lee reported to Dr. Magan he had not talked to anyone on Thanksgiving and had occasional thoughts of death, but was guarded about the nature of his thoughts. (R. 598.) By December 2023, he believed that Risperidone, for which he had been prescribed after another medication was discontinued, was working. (R. 602.) His lows were still there, including overthinking that he did not want to live, which happened every few days. (R. 602.) His dosage of Risperidone was increased. (R. 603.)

On April 4, 2024, State Agency review psychologist Nancy A. Kennedy Psy. D. offered an opinion based a review of evidence  to date. (R. 71). She opined that Lee could understand, retain, and follow simple instructions, "i.e. perform one and two step tasks"; could make simple decisions and would not require special supervision in order to sustain work; and could perform simple, routine, repetitive task a stable environment. (R. 71).

On July 28, 2024, State Agency review psychologist John David Chiampi Ph.D. stated he supported the "initial determination as written." (R. 90).

4

B. <u>Hearing Testimony</u>

At the hearing held on January 24, 2025, Lee testified that he is a high school graduate, and lives with his mother and younger brother. He said that he has worked at a number of jobs full time, but only for short periods because he has anxiety and has days when he feels he cannot be around other people. (R. 43-46.) He stated that he is bipolar and sees a psychiatrist because he sometimes has mood swings and gets angry very quickly. (R. 46-47.) He gets a tight feeling in his chest and feels as if he's going to pass out. (R. 47.)

Lee testified that he does not have friends or a girlfriend and the only person he talks to is his brother. (R. 47-48.) The ALJ asked what would happen if he had a job like loading boxes but not interacting with other people. Lee responded that he would do it, but he does not get enough sleep and is awake at night with thoughts racing in his head. (R. 48-49.) Lee's counsel asked him to confirm that he would be too exhausted to perform the job and Lee said that he was let go from a job with UPS for that exact reason. (R. 49.)

According to Lee, when he feels angry, he wants to hit something and has made a lot of holes in the wall of his room and broken his bed. (R. 50-51.) He has also engaged in cutting himself. (R. 51.) He gets maybe two to three hours of sleep a night. (R. 51-52.) He does not eat much, perhaps one meal a day, and mostly drinks liquids. (R. 52.) He stated that he could not follow the plot of movies and that, when his mother sends him to the grocery store, he cannot remember what to buy. (R. 53.) When asked if he had any issues with taking care of himself, he responded "sometimes I just don't feel like it." (R. 53.)

The ALJ also elicited testimony from a vocational expert ("VE"). (R. 54-62.) According to the ALJ, because Lee's past work was of such short duration or was part-time, he moved to a hypothetical for the fifth stage of the process. The ALJ asked the VE to assume an individual of

Lee's age, education, and no past work experience, but someone capable of medium level work. Further, the VE was to assume that this was an individual who should never climb ladders, ropes, or scaffolds, work at unprotected heights, work around moving mechanical parts or operate a motor vehicle; who would understand, remember and carry out simple instructions; who would interact with supervisors and coworkers occasionally but not the public; who could not perform work requiring a specific production rate such as assembly line work or work requiring hourly quotas; and who could only occasionally deal with changes in routine work settings. The VE testified that this hypothetical individual would be able to perform the following jobs: automobile detailer (unskilled, specification vocational preparation 2, meaning that it would take up to 30 days to learn the trade), store laborer (unskilled, SVP 2, medium exertion); and metal furniture assembler (unskilled, SVP 2, medium exertion) (R. 55-57.)

The ALJ then noted a recent change in Social Security regulations and asked the VE to identify the data sources he used to support his testimony. The VE indicated that he was using the Job Browser Pro, which is premised on US Department of Labor and Bureau of Labor Statistics, the Revised Handbook for Analyzing Job, the Guide for Occupational Exploration and the Vocational Diagnostic Assessment of Residual Employability. (R. 57.) The VE stated that these sources all defined exertion, education, and skill the same way that Social Security regulations and policy do. (R. 58.) When asked what is the maximum amount of time that a person could be off task for unskilled work, the VE stated that fifteen percent or more is work preclusive. (R. 59.) The VE confirmed that if the hypothetical individual were off task twenty-five percent of the time, no competitive work would be available. (R. 60.)

Lee's counsel asked if the answer would be different if the person could not interact with coworkers but only occasionally with a supervisor and the VE said there would be no jobs

available. (R. 61.) In addition, if the person required the instructions to be repeated more than twice, it would be work preclusive. (R. 62.)

### C. ALJ's Decision

The ALJ concluded that: (1) Lee met the insured status requirements through March 31, 2024; (2) he had not engaged in substantial gainful activity since January 1, 2022, the alleged onset date; (3) he had severe impairments of bipolar I disorder, mood disorder, anxiety disorder, dyslexia, and marijuana abuse; (4) he did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment; (5) he had the residual functional capacity ("RFC")[4] to perform medium duty work with restrictions;[5] (6) he has no past relevant work; (7) he was a younger individual on the alleged onset date; (8) he had at least a high school education; (9) transferability of skills was not material because he had no past relevant work; (10) there were jobs in significant numbers in the national economy that he could perform, including automobile detailer and metal furniture assembler; and (11) therefore, he was not disabled from January 1, 2022 through April 25, 2025. (R. 20-29.)

### III.    Standard of Review

"On judicial review, an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citing § 405(g)). The Court recently explained that:

---

[4] RFC is the most a claimant can do despite his or her physical and mental limitations. 20 C.F.R. § 404.1545(a)(1).
[5] Restrictions were as follows: he should never climb ladders, ropes, or scaffolds; he should never work at unprotected heights or around moving mechanical parts; he cannot operate a motor vehicle; he can understand, remember and carry out simple instructions; he is able to interact with supervisors and coworkers occasionally with the public never; he cannot perform work requiring a specific production rate such as assembly line work or work requiring hourly quotas; and he can only occasionally deal with changes in a routine work setting.

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." *Ibid.* It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison*, 305 U.S. at 229, 59 S. Ct. 206. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

*Id.* at 102-03 (other citations omitted).

The term "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Further:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

To evaluate disability claims, the Commissioner uses a five-step sequential process. The process requires an ALJ to consider: (1) whether the claimant is doing "substantial gainful activity"; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals the listings in the regulations; (4) whether, considering the claimant's RFC and past relevant work, the claimant can still perform past relevant work; and (5) if not, whether considering the claimant's RFC, age, education, and work experience, the claimant can make an adjustment to

other work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See Zirnsak v. Colvin*, 777 F.3d 607, 611-12 (3d Cir. 2014) (recounting the five-step process).

The claimant bears the burden of proof at steps one through four, including the determination of the RFC, although the ALJ makes the ultimate disability and RFC determinations. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Zirnsak*, 777 F.3d at 611. At the fifth step, the Commissioner bears the burden of demonstrating that the claimant is able to perform work that is available in the national economy. *Bowen*, 482 U.S. at 146 n.5; *Zirnsak*, 777 F.3d at 612. *See* 20 C.F.R. § 404.1560(c)(2) ("we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors.")

The Court of Appeals has explained that:

When, as in this instance, mental impairments are at issue, additional inquiries are layered on top of the basic five-step disability analysis. *Id.* §§ 404.1520a(a), 416.920a(a). An ALJ assesses mental impairments in the following way.

As part of step two of the disability analysis, the ALJ decides whether the claimant has any "medically determinable mental impairment(s)." *Id.* §§ 404.1520a(b)(1), 416.920a(b)(1); *see also id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (providing that, at step two, the ALJ determines whether the claimant has "a severe medically determinable physical or mental impairment"). Then, as part of that same step and also step three of the disability analysis, the ALJ determines "the degree of functional limitation resulting from the impairment(s)[.]" *Id.* §§ 404.1520a(b)(2), 416.920a(b)(2); *see also id.* §§ 404.1520a(d), 416.920a(d), 404.1520(a)(4)(ii)-(iii), 416.920(a)(4)(ii)-(iii) (explaining that the ALJ uses "the degree of functional limitation" in assessing "the severity of [the claimant's] mental impairment(s)[,]" which is considered at steps two and three). The ALJ does so in "four broad functional areas ... : Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). The first three of those areas are rated on a "five-point scale: None, mild, moderate, marked, and extreme." *Id.* §§ 404.1520a(c)(4), 416.920a(c)(4). The fourth is rated on a scale of: "None, one or two, three, four or more." *Id.*

The ALJ uses that degree rating in "determin[ing] the severity of [the] mental impairment(s)[,]" which is considered at steps two and three. *Id.* §§ 404.1520a(d), 416.920a(d); *see also id.* §§ 404.1520(a)(4)(ii)-(iii), 416.920(a)(4)(ii)-(iii) (stating

that, at steps two and three, the ALJ "consider[s] the medical severity of [the claimant's] impairment(s)"). "If ... the degree of [the claimant's] limitation in the first three functional areas [is] 'none' or 'mild' and 'none' in the fourth area, [the ALJ] will generally conclude that [the claimant's] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [his] ability to do basic work activities." *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1) (citation omitted).

At step three, if the ALJ has found that a mental impairment is severe, he "then determine[s] if it meets or is equivalent in severity to a listed mental disorder." *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2); *see also id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) (explaining that, at step three, the ALJ determines whether the claimant has "an impairment(s) that meets or equals" a listed impairment). That analysis is done "by comparing the medical findings about [the claimant's] impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder." *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). For example, the claimant may have the equivalent of a listed impairment if, *inter alia*, he has at least two of "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration[.]" *Id.* Pt. 404, Subpt. P, App. 1.

Finally, to complete steps four and five of the disability analysis, if the ALJ has found that the claimant does not have a listed impairment or its equivalent, the ALJ "will then assess [the claimant's mental RFC]." *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3); *see also id.* §§ 404.1520(a)(4)(iv)-(v), 416.920(a)(4)(iv)-(v) (providing that, at steps four and five, the ALJ considers the claimant's RFC).

*Hess v. Commissioner Soc. Sec.*, 931 F.3d 198, 202-03 (3d Cir. 2019).

## IV. Discussion

Lee raises one issue. He argues that although the ALJ found the reports from two State Agency psychologists to be "persuasive," his RFC did not contain a limitation that these opinions provided, and he did not explain the discrepancy. Both psychologists stated that Lee could perform 1-2 step tasks, which are considered consistent with level one reasoning, but the ALJ crafted an RFC with "simple instructions" and the VE offered two positions (auto detailer and metal furniture assembler) that have a reasoning level of two.

An ALJ's decision should be "should be accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Moreover, the ALJ  must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding. *Id.* at 705-06.

Specifically, courts have held that:

when a medical opinion is found persuasive and contains a limitation to one-and two-step tasks, the ALJ is obligated to either: (1) include the limitation in the RFC and limit the claimant to reasoning level one occupations, or, (2) identify the substantial evidence that the ALJ is relying on in rejecting the limitation. We further conclude that a limitation to "simple, repetitive tasks" is insufficient to account for a limitation to one- and two-step tasks.

*Cruz v. Bisignano*, 2025 WL 2813882, at *8 (M.D. Pa. Sept. 30, 2025). As the court noted, district courts in eight of the eleven circuits to have addressed this issue have come to the same conclusion. *Id.* at *7 (collecting cases). Within the Third Circuit, "the majority of courts have found the distinction to be meaningful." *Stine v. Kijakazi*, 2023 WL 3483885, at *9 (E.D. Pa. May 15, 2023) (citations omitted). *See also Sarah C. v. Bisignano*, 2026 WL 625094, at *8 (M.D. Pa. Mar. 5, 2026) ("courts have found that a limitation to one-to two-step tasks is consistent with GED Reasoning Development Level 1, but *inconsistent* with GED Reasoning Development Level 2.")

The Commissioner argues in response that under Social Security regulations, the ALJ was not required to address every individual limitation proposed by the state agency psychological reviewers or any other medical source. Rather, the ALJ was entitled to explain how he considered the findings in a single analysis by providing a "source-level" discussion, as he did here. See 20 C.F.R. § 404.1520c(b)(1) ("We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.") *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, at 5858

11

(describing this as "a reasonable articulation standard for determinations and decisions that does not require written analysis about how we considered each piece of evidence.")

In making this argument, the Commissioner references a decision that he contends is analogous to this matter. In *Reichenbach v. Comm'r*, 2024 WL 4336301 (W.D. Pa. Sept. 26, 2024), the court stated that:

> Plaintiff's argument centers on the opinions of Drs. Erin Urbanowicz, Psy.D., and Virginia Martin, Psy.D. Specifically, Plaintiff contends that the ALJ found these consultants' opinions to be persuasive as to how they opined that Plaintiff could carry out simple instructions consisting of no more than one to two steps. However, Plaintiff overlooks that while these sources did opine that he could only carry out one to two-step instructions, the ALJ found these opinions only "generally persuasive" and was under no obligation to adopt all of the limitations to which these doctors opined. *See Wilkinson v. Comm'r of Soc. Sec.*, 558 F. App'x 254, 256 (3d Cir. 2014) (stating "[a]s an initial matter, no rule or regulation compels an ALJ to incorporate into an RFC every finding made by a medical source simply because the ALJ gives the source's opinion as a whole 'significant' weight."). Accordingly, the ALJ's RFC limiting Plaintiff to "carrying out and remembering simple instructions," was not inherently improper because it did not adopt the consultants' language verbatim. The ALJ adequately explained the basis for his RFC findings, and these findings are supported by substantial evidence.

*Id.* at *1 n.1(W.D. Pa. Sept. 26, 2024) (record citations omitted).

Here, however, the ALJ did not find the two consultants' opinions to be only "general persuasive" and he did not reject their one-to-two-step limitation. Rather, he found these opinions "persuasive" and did not indicate that he was finding limitations other than what they articulated. As another court noted when the Commissioner cited *Wilkinson* for the proposition that an ALJ is under no obligation to incorporate every limitation made by a medical source:

> the issue is not whether the ALJ was compelled to include the one-to-two step limitation in the RFC, but rather whether the ALJ was required to consider it after finding the opinion persuasive. Courts in this district regularly remand when a medical opinion found persuasive imposes a limitation of one-to-two step tasks, but the ALJ fails to address it in his or her RFC.

*Sarah C. v. Bisignano*, 2026 WL 625094, at *7 (M.D. Pa. Mar. 5, 2026) (footnote omitted).

The ALJ was not required to adopt the one-to-step limitation in the RFC but having found the two psychologists' opinions that contained this limitation persuasive, he was required to indicate why he was not adopting the limitation. At this point, the ALJ then asked the VE about jobs that had a reasoning level of two without explaining how Lee could perform these jobs with the one-to-two-step limitation.

The Commissioner also argues that based on a recent Social Security Ruling, ALJs are "no longer require[d] . . . to identify and resolve conflicts between occupational information provided by . . . VEs and information in the DOT." SSR 24-3p 89 FR 97158, 97160 (Dec. 6, 2024). *See William D. v. Bisignano*, 2026 WL 809405, at *4 (E.D. Pa. Mar. 23, 2026). The Commissioner notes that, in this case, the ALJ explained the sources he used in finding jobs that someone with Lee's limitations could perform.

But that is not the issue Lee has raised. It is undisputed that the jobs the ALJ identified that Lee could perform had a reasoning level of two, regardless of whether they were found in the DOT or another source. But "a limitation to 'one-and two-step tasks' necessarily limits the claimant to reasoning level one occupations." *Cruz v. Bisignano*, 2025 WL 2813882, at *7 (M.D. Pa. Sept. 30, 2025) (footnote omitted).

The ALJ did not identify or explain this discrepancy. Therefore, the decision of the Commission is not supported by substantial evidence and the case must be remanded to the Commissioner for further review.

## V.    Conclusion

For these reasons, the Court will grant summary judgment in favor of Lee and remand this case to the Commissioner for further review.

An appropriate order follows.

Date: July 13, 2026                              BY THE COURT:


                                                 /s/ Patricia L. Dodge
                                                 PATRICIA L. DODGE
                                                 UNITED STATES MAGISTRATE JUDGE

14